B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Randy A. and Jennifer Glass | DEFENDANTS Bank of America |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.) James O. Clough  235 Newman Avenue 540.433.9881  Harrisonburg VA 22801 | ATTORNEYS (If Known) |

| PARTY (Check One Box Only) ☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor ☐ Other ☐ Trustee | PARTY (Check One Box Only) ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☒ Creditor ☐ Other ☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Motion to Avoid and Release Deed of Trust
USC Section 1322 and Bankruptcy Rule 7001

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  n/a |

Other Relief Sought

N/A

**B104 (FORM 104) (08/07), Page 2**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>　Randy A. and Jennifer Glass | BANKRUPTCY CASE NO.<br>　09-51160 | |
| DISTRICT IN WHICH CASE IS PENDING<br>　VAWB | DIVISION OFFICE | NAME OF JUDGE |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>　/s/ James O. Clough | |
|---|---|
| DATE<br>　　　　July 6, 2010 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>　James O. Clough |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 104 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

In re: Randy A. Glass                          BK no:  09-51160
       Jennifer Glass

                                               Chapter 13

Randy A. Glass
Jennifer Glass

               Plaintiffs/Debtors.
v.

Bank of America
PO Box 5170
Simi Valley, California 93062-5170
               Defendant.

Serve:

Registered Agent
CT Corporation System
4701 Cox Road, Suite 301
Richmond, Virginia 23060-6802

**MOTION TO AVOID AND RELEASE DEED OF TRUST**

     Come now the Plaintiffs, Randy A. and Jennifer Glass, by counsel, pursuant to
U.S.C. §1322 and Bankruptcy Rule 7001, and respectfully state as follows:

1.  This is a core proceeding and this Court has jurisdiction over the issues
   pursuant to 28 U.S.C. § 157 and § 1334.

2.  That yourPlaintiffs filed for relief under Chapter 13 of Title 11 of the United
   State Code on July 27, 2009.

3.  The Plaintiffs/Debtors owned at the time of filing (and still own) real estate
   located at 102 Fortress Drive, Winchester, Virginia and that this real estate
   has a current value of two hundred fifteen thousand dollars ($ 215,000.00.)

(See copy of the appraisal which is attached as "Exhibit A" to these pleadings.)

4.   The Plaintiffs owe a debt of approximately seventy four thousand two hundred eighty eight dollars and twenty seven cents ($ 74, 288.27) to the Defendant. The debt, originally to Countrywide Home Loans, Inc., and now serviced by the Defendant, was secured by a second Deed of Trust on the real estate and recorded as Instrument number 060024343 on December 29, 2006 in the Circuit Court Clerk's office of Fredrick County, Virginia. (See copy which is attached as "Exhibit B" to these pleadings.)

5.   Prior to the recording of the Defendant's second deed of trust, a first deed of trust on the property secured a debt owed to Countrywide Home Loans, Inc., now serviced by Bank of America, by the Plaintiffs for approximately two hundred ninety seven thousand dollars ($ 297,000.00) This Deed of Trust is on record in the Circuit Court Clerk's Office of Fredrick County Virginia as Instrument 060024342, dated December 29, 2006.  (See copy which is attached as "Exhibit C" to these pleadings.)

6.   Therefore, the debt owed to the Defendant is wholly unsecured, as the said real estate is actually worth less than the sum owed for the debt secured by the first deed of trust.  As a result this, the second deed of trust lien should be voided and released pursuant to 11 U.S.C. § 1322.

7.   In support of this Motion, the Debtor refers the Court to the following cases: In re: Midland, 414 B.R. 73, (D. Md. 2009); Zimmer v. PSB Lending Corp., 313 F. 3d 1220 (9th Cir. 2002); Lane v. W. Interstate Bancorp, 280 F. 3d 663 (6th Cir, 2006);  Pond v. Farm Specialist Realty, 253 F.3d 122 (2d Cir.2001); Tanner v. First-Plus Fin., Inc., 217 F.3d 1357 (11th Cir. 2000); Bartee v. Tara Colony Homeowners Association, 212 F.3d 277, (5th Cir 2000); McDonald v. Master Fin., Inc., 205 F.3d 606 (3rd Cir. 2000); Domestic Bank v. Mann, 249 B.R. 831(1st Cir. BAP 2000);  Wright v, Commercial Credit Corporation, 178 B.R. 7033 (Bankr. E.D. VA 1995); Elliott v.  Citifinancial Inc., Adversary Case 07-06064 (Judge Anderson, Western District of VA.)

WHEREFORE, Plaintiffs pray that this Court enter an Order, pursuant to 11 U.S.C. §506 and  11 U.S.C. §1322, which holds that the debt owed by the Plaintiffs to the Defendant  is a wholly unsecured debt that voids and releases the Deed of Trust of the Defendant, on record in the said clerk's office as Instrument 060024343, and that provides for the recording of such release in the record books of the Circuit Court where the property is located  and  orders that any proof of claim filed in the Plaintiff's bankruptcy be considered  an unsecured claim,  and allows for such other relief as this Court in equity deems proper.

Respectfully presented,
Randy A. and Jennifer Glass
By counsel

**/s/ James O. Clough**
James O. Clough
235 Newman Ave
Harrisonburg VA 22801
540.433.9881 Telephone
540.434.2642 Facsimile
jcloughlaw@cs.com
Counsel for Debtors

File No. A10419

## APPRAISAL OF



SINGLE FAMILY RESIDENCE

## LOCATED AT:

102 FORTRESS DR
WINCHESTER, VA  22603-4285

## FOR:

RANDY A GLASS
102 FORTRESS DR
WINCHESTER, VA  22603

## BORROWER:

MARKET VALUE

## AS OF:

June 24, 2010

## BY:

ADAM ARKFELD
ARKFELD APPRAISALS

# UNIFORM RESIDENTIAL APPRAISAL REPORT

**Property Description**

SUMMARY    File No. A10419

| Property Address | 102 FORTRESS DR | City | WINCHESTER | State | VA | Zip Code | 22603-4285 |
|---|---|---|---|---|---|---|---|

Legal Description  STAR FORT L33S2    County FREDERICK

Assessor's Parcel No. 38484    Tax Year 2010   R.E. Taxes $ 1,051.00   Special Assessments $ NONE

Borrower MARKET VALUE    Current Owner Randy & Jennifer Glass    Occupant: [X] Owner   [ ] Tenant   [ ] Vacant

Property rights appraised   [X] Fee Simple   [ ] Leasehold   Project Type   [ ] PUD   [ ] Condominium (HUD/VA only)   HOA$ _____ /Mo.

Neighborhood or Project Name STAR FORT    Map Reference 54N-2-2-33    Census Tract 0511.00

Sale Price $ N/A   Date of Sale N/A   Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client  RANDY A GLASS    Address 102 FORTRESS DR, WINCHESTER, VA 22603

Appraiser  ADAM ARKFELD    Address 212 S. BRADDOCK ST, WINCHESTER, VA 22601

**NEIGHBORHOOD**

| Location | [ ] Urban [X] Suburban [ ] Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|

Built up  [X] Over 75% [ ] 25-75% [ ] Under 25%    PRICE $(000)   AGE (yrs)   One family 55%   [X] Not likely [ ] Likely

Growth rate  [ ] Rapid [X] Stable [ ] Slow    [X] Owner   Low 80  1   2-4 family 5%   [ ] In process

Property values  [ ] Increasing [X] Stable [ ] Declining   [ ] Tenant   High 750  50+   Multi-family 5%   To: _____

Demand/supply  [ ] Shortage [X] In balance [ ] Over supply   [ ] Vacant (0-5%)   Predominant   Commercial 5%

Marketing time  [ ] Under 3 mos. [X] 3-6 mos. [ ] Over 6 mos.   [ ] Vacant (over 5%)   200  20   Vacant ( ) 30%

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:  SEE LOCATION MAP

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
THE SUBJECT IS LOCATED WITHIN EASY ACCESS TO EMPLOYMENT CENTERS IN  WINCHESTER AND TO THE CORRIDORS INTO THE NORTHERN VIRGINIA AREA. AMENITIES INCLUDE A COUNTY PARK, BUS SERVICE TO THE LOCAL SCHOOLS, AND THE SERVICE OF THE NEARBY FIRE DEPARTMENT.   WINCHESTER HOSPITAL IS LOCATED ABOUT 2 MILES AWAY AND A REGIONAL MALL IS LOCATED ABOUT 3 MILES TO THE SOUTH.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):
MARKET CONDITIONS SHOW SIGNS OF STABILIZING.  SIMILAR PROPERTIES USUALLY EXPERIENCE A SELLING TIME FRAME OF 3-6 MONTHS.

**PUD**

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?   [ ] YES   [X] NO

Approximate total number of units in the subject project  N/A    Approximate total number of units for sale in the subject project  N/A

Describe common elements and recreational facilities: THE SUBJECT IS NOT IN A P.U.D.

**SITE**

| Dimensions PLAT NOT PROVIDED BY OWNER | | Topography | SLOPING |
|---|---|---|---|

Site area  .33 ACRE    Corner Lot [ ] Yes [X] No   Size   TYPICAL

Specific zoning classification and description RP-RESIDENTIAL PERFORMANCE   Shape  RECTANGULAR

Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning   Drainage  ADEQUATE

Highest & best use as improved: [X] Present use [ ] Other use (explain)   View  NEIGHBORHOOD

Utilities    Public    Other   Off-site Improvements  Type   Public  Private   Landscaping  TYPICAL

Electricity  [X]      Street  ASPHALT   [X]      Driveway Surface  ADEQUATE

Gas      NONE/TYPICAL   Curb/gutter NONE/TYPICAL   [ ]     Apparent easements NONE APPARENT

Water  [X]      Sidewalk  NONE/TYPICAL   [ ]     FEMA Special Flood Hazard Area [ ] Yes [X] No

Sanitary sewer [X]      Street lights NONE/TYPICAL   [ ]     FEMA Zone X   Map Date 09/02/2009

Storm sewer   NONE/TYPICAL   Alley  NONE/TYPICAL   [ ]     FEMA Map No. 51069C0208D

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.):    THE APPRAISER DID NOT NOTE ANY ADVERSE ENCROACHMENTS, ASSESSMENTS, SLIDE AREAS OR NON-CONFORMING ZONING USES ON OR NEAR THE SUBJECT PROPERTY.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units 1 | Foundation MASON | Slab NO | Area Sq.Ft. 0 | Roof [ ] |
| No. of Stories 2 | Exterior Walls BRK/SIDING | Crawl Space YES | % Finished N/A | Ceiling [ ] |
| Type (Det./Att.) DETACHD | Roof Surface Composition | Basement NO | Ceiling N/A | Walls [ ] |
| Design (Style) CONTEMP | Gutters & Dwnspts. METAL | Sump Pump NONE NOTED | Walls N/A | Floor [ ] |
| Existing/Proposed EXISTING | Window Type DBL HUNG | Dampness NONE NOTED | Floor N/A | None [ ] |
| Age (Yrs.) 9 YEARS | Storm/Screens THERM/YES | Settlement NONE NOTED | Outside Entry N/A | Unknown [X] |
| Effective Age (Yrs.) 3 | Manufactured House NO | Infestation NONE NOTED | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 0 |
| Level 1 | | 1 | 1 | 1 | | 1 | | | .5 | 1 | | 1,033 |
| Level 2 | | | | | | | | 3 | 2 | | | 966 |

Finished area above grade contains:   6 Rooms;   3 Bedroom(s);   2.5 Bath(s);   1,999 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE: |
|---|---|---|---|---|---|---|
| Floors | Vin/WD/AVERAGE | Type GFA | Refrigerator [P] | None [ ] | Fireplace(s) # 1 [X] | None [ ] |
| Walls | DW/AVERAGE | Fuel NRL GAS | Range/Oven [P] | Stairs [P] | Patio [ ] | Garage 2 # of cars |
| Trim/Finish | WOOD/AVERAGE | Condition TYPICAL | Disposal [P] | Drop Stair [P] | Deck YES [ ] | Attached YES |
| Bath Floor | VINYL/AVERAGE | COOLING | Dishwasher [P] | Scuttle [X] | Porch FRONT [1] | Detached [ ] |
| Bath Wainscot | DW/AVERAGE | Central CAC | Fan/Hood [P] | Floor [ ] | Fence [ ] | Built-In [ ] |
| Doors | MAS/AVERAGE | Other | Microwave [P] | Heated [ ] | Pool [ ] | Carport [ ] |
| | | Condition TYPICAL | Washer/Dryer [P] | Finished [ ] | | Driveway Asphalt |

Additional features (special energy efficient items, etc.):  VAULTED CEILINGS

**COMMENTS**

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.:  NO SPECIFIC PHYSICAL, FUNCTIONAL OR EXTERNAL DEPRECIATION WAS NOTED DURING THE INSPECTION OF THE SUBJECT PROPERTY. THE SUBJECT IS IN AVERAGE CONDITION.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:  NO ADVERSE ENVIRONMENTAL CONDITIONS WERE VIEWED ON OR NEAR THE SUBJECT PROPERTY.

UNIFORM RESIDENTIAL APPRAISAL REPORT

**Valuation Section**    SUMMARY    File No. A10419

## COST APPROACH

| | | | |
|---|---|---|---|
| ESTIMATED SITE VALUE . . . . . . . . . . . . . . . . . . . . . . . . . . . = $ | 50,000 | Comments on Cost Approach (such as, source of cost estimate, | |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | | site value, square foot calculation and for HUD, VA and FmHA, the | |
| Dwelling  1,999  Sq. Ft. @ $ 60.00 = $ | 119,940 | estimated remaining economic life of the property): | |
| Bsmt. 0  Sq. Ft. @ $ 20.00 = $ | 0 | THE COST ESTIMATES ARE CALCULATED USING THE | |
| FIREPLACE/2 DECKS/PORCH | 14,000 | MARSHALL & SWIFT COST ESTIMATING GUIDE, LOCAL | |
| Garage/Carport  396  Sq. Ft. @ $ 20.00 = | 7,920 | CONTRACTOR PRICING AND THE EXPERIENCE OF THE | |
| Total Estimated Cost New . . . . . . . . . . . . . . . . = $ | 141,860 | APPRAISER.  DEPRECIATION IS CALCULATED USING | |
| Less  70 Physical  Functional  External  Est. Remaining Econ. Life: 67 | | THE AGE-LIFE METHOD WITH AN EFFECTIVE AGE OF 3 | |
| Depreciation $5,674 = $ | 5,674 | YEARS AND AN ESTIMATED ECONOMIC LIFESPAN OF | |
| Depreciated Value of Improvements . . . . . . . . . . . . . . . . = $ | 136,186 | 70 YEARS. | |
| "As-is" Value of Site Improvements . . . . . . . . . . . . . . . . = $ | 30,000 | | |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . . . = $ | 216,200 | | |

## SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | +(-) $ Adjustment | COMPARABLE NO. 2 | +(-) $ Adjustment | COMPARABLE NO. 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 102 FORTRESS DR<br>WINCHESTER | 202 SENTINEL DR<br>WINCHESTER VA 22603 | | 1083 SUNNYSIDE DRIVE<br>WINCHESTER VA 22603 | | 1133 CARPERS DR<br>WINCHESTER VA 22603 | |
| Proximity to Subject | | 0.12 miles E | | 0.20 miles NW | | 0.23 miles NW | |
| Sales Price | $ N/A | $ 245,000 | | $ 193,000 | | $ 195,000 | |
| Price/Gross Liv. Area | $ 0.00 ⊘ | $ 104.52 ⊘ | | $ 103.10 ⊘ | | $ 148.51 ⊘ | |
| Data and/or<br>Verification Sources | TAX RECORDS<br>INSPECTION | MLS & TAX RECORDS<br>DRIVE-BY INSPECTION | | MLS & TAX RECORDS<br>DRIVE-BY INSPECTION | | MLS & TAX RECORDS<br>DRIVE-BY INSPECTION | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing<br>Concessions | | D.O.M. 24<br>CONV/$0 | | D.O.M. 199<br>FHA/$8685 | -8,700 | D.O.M. 14<br>VA/$5550 | -5,600 |
| Date of Sale/Time | N/A | SD-04/20/2010 | | SD-04/29/2010 | | SD-04/27/2010 | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | .33 ACRE | .47 ACRE | | 1.00 ACRE | -2,000 | .39 ACRE | |
| View | NEIGHBORHD | NEIGHBORHD | | NEIGHBORHD | | COUNTRYSIDE | |
| Design and Appeal | CONTEMP | 2 STORY | | 2 STORY | | CONTEMP | |
| Quality of Construction | BRK/SIDING | SIDING | 3,000 | SIDING | 3,000 | BRICK/SIDING | |
| Age | 9 YEARS | 6 YEARS | | 4 YEARS | -4,000 | 2 YEARS | -6,000 |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | GOOD-REO | -6,000 |
| Above Grade<br>Room Count | Total 25 Bdrms Baths<br>6 3 2.50 | Total Bdrms Baths<br>7 4 2.50 | | Total Bdrms Baths<br>7 4 3.00 | -3,000 | Total Bdrms Baths<br>5 3 2.00 | 3,000 |
| Gross Living Area | 1,999 Sq.Ft. | 2,344 Sq.Ft. | -8,600 | 3,200 Sq.Ft. | 3,200 | 1,313 Sq.Ft. | 17,150 |
| Basement & Finished<br>Rooms Below Grade | CRAWL<br>NO FINISH | FULL BSMNT<br>NO FINISH | -8,000 | FULL BSMNT<br>NO FINISH | -8,000 | FULL BSMNT<br>NO FINISH | -8,000 |
| Functional Utility | ADEQUATE | ADEQUATE | | ADEQUATE | | ADEQUATE | |
| Heating/Cooling | GFA/CAC | GFA/CAC | | PFA/NONE | 6,000 | FWA/CAC | |
| Energy Efficient Items | THERM. WIND | THERM. WIND | | THERM. WIND | | THERM. WIND | |
| Garage/Carport | 2 CAR/ATT | 2 CAR/ATT | | 2 CAR/DET | -2,000 | 2 CAR/ATT | |
| Porch, Patio, Deck,<br>Fireplace(s), etc. | Porch,Decks<br>1 FIREPLACE | PORCH/DECK<br>NO FIREPLACE | 3,000<br>3,000 | PORCH/PATIO<br>1 FIREPLACE | 4,000 | NONE<br>NO FIREPLACE | 8,000<br>3,000 |
| Fence, Pool, etc. | NONE | NONE | | NONE | | NONE | |
| OTHER | NONE | NONE | | NONE | | NONE | |
| Net Adj. (total) | | ☐ + ☒ - $ | 7,600 | ☐ + ☒ - $ | 11,500 | ☒ + ☐ - $ | 5,550 |
| Adjusted Sales Price<br>of Comparable | | Gross: 10.4%<br>Net: -3.1% $ | 237,400 | Gross: 22.7%<br>Net: -6.0% $ | 181,500 | Gross: 29.1%<br>Net: 2.8% $ | 200,550 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): THE SALES USED ARE CONSIDERED TO BE THE BEST AVAILABLE COMPARABLES. RECENT TRANSFERS OF MORE SIMILAR HOMES COULD NOT BE LOCATED IN THE SUBJECT'S MARKET AREA. THE LOCATION ADJUSTMENTS ARE MADE DUE TO THE SUBJECT'S PROXIMITY TO A HIGH TENSION POWER LINE EASEMENT. THE DISTANCES ARE DUE TO THE RURAL NATURE OF THE AREA AND CONSIDERED NORMAL.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data<br>Source for prior sales<br>within year of appraisal | Last Transfer Not<br>Within LastYear<br>TAX RECORDS | LAST TRANSFER NOT<br>WITHIN LAST YEAR<br>TAX RECORDS | LAST TRANSFER NOT<br>WITHIN LAST YEAR<br>TAX RECORDS | LAST TRANSFER REO<br>WITHIN LAST YEAR<br>TAX RECORDS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: The subject property has not listed in the last 12 months nor has it transferred in the past 36 months.

## RECONCILIATION

INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 215,000

INDICATED VALUE BY INCOME APPROACH (If Applicable)  Estimated Market Rent $ _____ /Mo. x Gross Rent Multiplier N/A = $ N/A

This appraisal is made ☒ "as-is"  ☐ subject to the repairs, alterations, inspections or conditions listed below  ☐ subject to completion per plans and specifications.
Conditions of Appraisal: THIS REPORT IS NOT INTENDED FOR LENDING PURPOSES.

Final Reconciliation: THE SALES COMPARISON APPROACH IS RELIED UPON FOR THE VALUE ESTIMATE. THE COST APPROACH SUPPORTS THE ESTIMATE OF VALUE AND INSUFFICIENT DATA IS AVAILABLE TO SUPPORT THE INCOME APPROACH.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  10/96  ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF  06/24/2010
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 215,000 .

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature  *Adam Arkfeld* | Signature | ☐Did  ☐Did Not |
| Name  ADAM ARKFELD | Name | Inspect Property |
| Date Report Signed  06/30/2010 | Date Report Signed | |
| State Certification #  4001-005362  State VA | State Certification # | State |
| Or State License # | Or State License # | State |

**Supplemental Valuation Section**   UNIFORM RESIDENTIAL APPRAISAL REPORT   SUMMARY   File No. A10419

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 102 FORTRESS DR WINCHESTER | 125 FORTRESS DR WINCHESTER VA 22603 | | | | | |
| Proximity to Subject | | 0.18 miles NNE | | | | | |
| Sales Price | $ N/A | $ 236,000-LP | | $ | | $ | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 134.09 ☑ | | $ ☑ | | $ 0.00 ☑ | |
| Data and/or Verification Sources | TAX RECORDS INSPECTION | MLS & TAX RECORDS DRIVE-BY INSPECTION | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing Concessions | | D.O.M. 149 ACTIVE | -8,000 | | | | |
| Date of Sale/Time | N/A | LD-01/27/2010 | | | | | |
| Location | AVERAGE | AVERAGE | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | .33 ACRE | .33 +/- ACRE | | | | | |
| View | NEIGHBORHD | COUNTRYSIDE | | | | | |
| Design and Appeal | CONTEMP | 2 STORY | | | | | |
| Quality of Construction | BRK/SIDING | SIDING | | | | | |
| Age | 9 YEARS | 11 YEARS | | | | | |
| Condition | AVERAGE | AVERAGE | | | | | |
| Above Grade Room Count | Total 6 : Bdrms 3 : Baths 2.50 | Total 6 : Bdrms 3 : Baths 2.50 | | Total : Bdrms : Baths | | Total : Bdrms : Baths | |
| Gross Living Area | 1,999 Sq.Ft. | 1,760 Sq.Ft. | 5,975 | Sq.Ft. | | Sq.Ft. | |
| Basement & Finished Rooms Below Grade | CRAWL NO FINISH | CRAWL NO FINISH | | | | | |
| Functional Utility | ADEQUATE | ADEQUATE | | | | | |
| Heating/Cooling | GFA/CAC | GFA/CAC | | | | | |
| Energy Efficient Items | THERM. WIND | THERM. WIND | | | | | |
| Garage/Carport | 2 CAR/ATT | 1 Car Att/1 Car De | -1,000 | | | | |
| Porch, Patio, Deck, Fireplace(s). etc. | Porch,Decks 1 FIREPLACE | PORCH 1 FIREPLACE | 6,000 | | | | |
| Fence, Pool, etc. | NONE | NONE | | | | | |
| OTHER | NONE | NONE | | | | | |
| Net Adj. (total) | | ☒ + ☐ - $ | 2,975 | ☒ + ☐ - $ | 0 | ☒ + ☐ - $ | 0 |
| Adjusted Sales Price of Comparable | | Gross: 8.9% Net: 1.3% $ | 238,975 | Gross: 0.0% Net: 0.0% $ | 0 | Gross: 0.0% Net: 0.0% $ | 0 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc. ):

| ITEM | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | Last Transfer Not Within LastYear TAX RECORDS | LAST TRANSFER NOT WITHIN LAST YEAR TAX RECORDS | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:

THE REPORT IS NOT INTENDED TO BE A HOME INSPECTION AND THE APPRAISER RECOMMENDS ONE IF ANY PARTY HAS CONCERNS ABOUT THE CONDITION OF THE PROPERTY.

THE COST APPROACH IS NOT INTENDED FOR INSURANCE VERIFICATION PURPOSES.

Produced using ACI software, 800 234 8727 www.aciweb.com

File No. A10419

**DEFINITION OF MARKET VALUE:**    The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**    The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

File No.  A10419

**APPRAISERS CERTIFICATION:**    The Appraiser certifies and agrees that:

1.  I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation.  If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2.  I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report.  I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3.  I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4.  I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report  on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5.  I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6.  I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal.  I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7.  I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply.  I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8.  I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report.  I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them.  I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9.  I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report.  If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:**    If a  supervisory  appraiser  signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**   102 FORTRESS DR, WINCHESTER, VA  22603-4285

**APPRAISER:**

Signature: _Adam Arkfeld_
Name:  ADAM ARKFELD
Date Signed:  06/30/2010
State Certification #:  4001-005362
or State License #: _____
State: VA _____
Expiration Date of Certification or License:  08/31/2010

**SUPERVISORY APPRAISER (only if required)**

Signature: _____
Name: _____
Date Signed: _____
State Certification #: _____
or State License #: _____
State: _____
Expiration Date of Certification or License: _____

☐ Did   ☐ Did Not Inspect Property

ARKFELD APPRAISALS

| | | |
|---|---|---|
| Borrower: MARKET VALUE | | File No.: A10419 |
| Property Address: 102 FORTRESS DR | | Case No.: |
| City: WINCHESTER | State: VA | Zip: 22603-4285 |
| Lender: RANDY A GLASS | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: June 24, 2010
Appraised Value: $ 215,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

| | |
|---|---|
| Borrower: MARKET VALUE | File No.: A10419 |
| Property Address: 102 FORTRESS DR | Case No.: |
| City: WINCHESTER | State: VA | Zip: 22603-4285 |
| Lender: RANDY A GLASS | |



**COMPARABLE SALE #1**

202 SENTINEL DR
WINCHESTER VA 22603
Sale Date: SD-04/20/2010
Sale Price: $ 245,000



**COMPARABLE SALE #2**

1083 SUNNYSIDE DRIVE
WINCHESTER VA 22603
Sale Date: SD-04/29/2010
Sale Price: $ 193,000



**COMPARABLE SALE #3**

1133 CARPERS DR
WINCHESTER VA 22603
Sale Date: SD-04/27/2010
Sale Price: $ 195,000

| | |
|---|---|
| Borrower: MARKET VALUE | File No.: A10419 |
| Property Address: 102 FORTRESS DR | Case No.: |
| City: WINCHESTER | State: VA Zip: 22603-4285 |
| Lender: RANDY A GLASS | |



**COMPARABLE SALE #4**

125 FORTRESS DR
WINCHESTER VA 22603
Sale Date: LD-01/27/2010
Sale Price: $ 236,000-LP

**COMPARABLE SALE #5**

Sale Date:
Sale Price: $

**COMPARABLE SALE #6**

Sale Date:
Sale Price: $

**FLOORPLAN**

| Borrower: MARKET VALUE | | File No.: A10419 |
| Property Address: 102 FORTRESS DR | | Case No.: |
| City: WINCHESTER | State: VA | Zip: 22603-4285 |
| Lender: RANDY A GLASS | | |



Sketch by Apex IV Windows™

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Totals |
| GLA1 | First Floor | 1032.60 | 1032.60 |
| GLA2 | Second Floor | 966.00 | 966.00 |
| GAR | Garage | 396.00 | 396.00 |
| | | | |
| TOTAL LIVABLE    (rounded) | | | 1999 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 17.0  x  28.0 | | 476.00 |
| 23.0  x  24.2 | | 556.60 |
| Second Floor | | |
| 24.0  x  32.0 | | 768.00 |
| 11.0  x  18.0 | | 198.00 |
| | | |
| 4 Areas Total (rounded) | | 1999 |

LOCATION MAP

| Borrower: MARKET VALUE | | File No.:  A10419 | |
| Property Address: 102 FORTRESS DR | | Case No.: | |
| City: WINCHESTER | State: VA | Zip: 22603-4285 |
| Lender: RANDY A GLASS | | | |



| Borrower: MARKET VALUE | | File No.: A10419 |
| Property Address: 102 FORTRESS DR | | Case No.: |
| City: WINCHESTER | State: VA | Zip: 22603-4285 |
| Lender: RANDY A GLASS | | |



Subject
102 FORTRESS DR
WINCHESTER, VA  22603-4285

**FloodMap Legend**

Flood Zones

Areas inundated by 500-year flooding

Areas outside the 100- and 500-year floodplains

Areas inundated by 100-year flooding

Areas inundated by 100-year flooding with velocity hazard

Floodway areas

Floodway areas with velocity hazard

Areas of undetermined but possible flood hazards

Areas not mapped on any published FIRM

**Flood Information**

Community: 510063 - UNINCORPORATED AREA

Property is not in a FEMA special flood hazard area.

Map Number: 51069C0208D       Map Date: 09/02/2009
Panel: 0208D                   FIPS: 51069
Zone: X

Neither Transamerica Flood Hazard Certification (TFHC) nor ACI make any
representations or warranties to any party concerning the content, accuracy or
completeness of this flood report, including any warranty of merchantability or
fitness for a particular purpose. Neither TFHC nor ACI nor the seller of this
flood report shall have any liability to any third party for any use or misuse of
this flood report.

File No. A10419

********* INVOICE *********

File Number: A10419                              JUNE 24, 2010


RANDY A GLASS
102 FORTRESS DR
WINCHESTER, VA 22603


Borrower :        MARKET VALUE

Invoice # :       A10419
Order Date :      06/18/2010
Reference/Case # :
PO Number :

1004 RESIDENTIAL APPRAISAL

102 FORTRESS DR
WINCHESTER, VA  22603-4285


        APPRAISAL                       $        350.00
                                        $
                                        - - - - - - - - - - - -

        Invoice Total                   $        350.00
        State Sales Tax @               $          0.00
        Deposit                        ($        350.00  )
        Deposit                        ($                )
                                        - - - - - - - - - - - -
        Amount Due                      $          0.00


Terms:   DUE AT INSPECTION - PAID IN FULL CHECK #1271 THANK YOU


Please Make Check Payable To:

ERIC ARKFELD
212 S BRADDOCK STREET
WINCHESTER VA 22601

Fed. I.D. #: 230139459

                    ARKFELD APPRAISALS
            212 S BRADDOCK ST., WINCHESTER VA 22601

**060024343**

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O. Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CHRISTOPHER CHAKFORD

6440 SOUTHPOINT PARKWAY #300
JACKSONVILLE
FL 32216

Phone: (866)205-9595

RPC/Tax Map Reference #:
38484

---

2006110142                    [Space Above This Line For Recording Data]

                                                        0001541302981 2006
                                                              [Doc ID #]
** TICOR Title Insurance Company
Policy Number not          **CREDIT LINE DEED OF TRUST**
available at this time              (Line of Credit)

                              MIN 1001337-0001831488-3

     THIS IS A CREDIT LINE DEED OF TRUST AND SECURES THE MAXIMUM AGGREGATE
PRINCIPAL AMOUNT OF $ 74,400.00              OUTSTANDING AT ANY ONE TIME.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS
THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY
CONVEYED.**

     THIS CREDIT LINE DEED OF TRUST, dated  DECEMBER 12, 2006    , is between
RANDY A. GLASS

Jennifer M Glass

residing at
102 FORTRESS DR, WINCHESTER, VA 22603-4285
the person or persons signing as "Grantor(s)" below and hereinafter referred to as "we," "our," or "us" and
**FREDERICK** SAMUEL I WHITE, PC
as trustee and hereinafter referred to as the "Trustee," with an address at
209 BUSINESS PARK DRIVE VIRGINIA BEACH, VA 23462-
for the benefit of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") a Delaware
corporation, with an address of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. **MERS is the
"Beneficiary" under this Credit Line Deed of Trust ("Deed of Trust") and is acting solely as nominee for**
Countrywide Bank, N.A.

● MERS HELOC - VA Deed of Trust
2E032-VA (05/06)(d)                     Page 1 of 5





DOC ID #: 00015413029812006

("Lender" or "you") and its successors and assigns, with an address of
1199 North Fairfax St. Ste.500, Alexandria, VA 22314

**PREMISES:** In consideration of the loan hereinafter described, we hereby mortgage, grant and convey to the Trustee, in trust, the premises located at:

102 FORTRESS DR, WINCHESTER

Street, Municipality

FREDERICK                      Virginia 22603-4285 (the "Premises").

[County]                                      [Zip]

to secure that certain Home Equity Credit Line Agreement and Disclosure Statement (the "Note") dated
DECEMBER 12, 2006     and the other covenants and agreements hereinafter set forth and further described as:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto.

WE UNDERSTAND and agree that MERS is a separate corporation acting solely as nominee for Lender and Lender's successors and assigns, and holds only legal title to the interests granted by us in this Deed of Trust, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing or canceling this Deed of Trust.

LOAN: This Deed of Trust will secure your loan to us in the principal amount of $74,400.00 or so much thereof as may be advanced and readvanced from time to time to
RANDY GLASS

the Borrower(s) under the Note, plus interest and costs, late charges and all other charges related to the loan, all of which sums are repayable according to the Note. This Deed of Trust will also secure the performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and agreements in this Deed of Trust, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of the section of this Deed of Trust entitled "Our Authority To You." Loans under the Note may be made, repaid and remade from time to time in accordance with the terms of the Note and subject to the Credit Limit set forth in the Note.

OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage, grant and convey the Premises to the Trustee.

OUR IMPORTANT OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Deed of Trust

DOC ID #: 00015413029812006

is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Deed of Trust, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Deed of Trust.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises. It is agreed that the Lender shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the Agreement secured hereby.

(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Deed of Trust, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Deed of Trust secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Deed of Trust. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Deeds of Trusts.

(g) PRIOR DEED OF TRUST: If the provisions of this paragraph are completed, this Deed of Trust is subject and subordinate to a prior deed of trust dated                             and given by us for the benefit of
WAMU
as beneficiary, in the original amount of $ 0.00                    (the "Prior Deed of Trust"). We shall not increase, amend or modify the Prior Deed of Trust without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Deed of Trust promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Deed of Trust as and when required under the Prior Deed of Trust.

(h) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) SALE OF PREMISES: We will not sell, transfer ownership of, mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) INSPECTION: We will permit you to inspect the Premises at any reasonable time.

DOC ID #: 00015413029812006

**NO LOSS OF RIGHTS:** The Note and this Deed of Trust may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Deed of Trust without losing your rights in the Premises.

**DEFAULT:** Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition of default as described in the Note occurs, the Trustee may foreclose upon this Deed of Trust or sell the Premises at a public sale. This means that you or the Trustee may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Deed of Trust. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. In addition, you or the Trustee may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including over-due rental payments, directly from tenants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set forth in the Note will continue before and after a default, entry of a judgment and foreclosure or public sale. In addition, you shall be entitled to collect all reasonable fees and costs actually incurred by you in proceeding to foreclosure or public sale, including, but not limited to, trustee's fees, reasonable attorneys fees and costs of documentary evidence, abstracts and title reports.

**ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER:** As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

**WAIVERS:** To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Deed of Trust and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

**BINDING EFFECT:** Each of us shall be fully responsible for all of the promises and agreements in this Deed of Trust. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Deed of Trust will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Deed of Trust is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Deed of Trust, and provided any obligation to make further advances under the Note has terminated, this Deed of Trust and your rights in the Premises shall end.

**NOTICE:** Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your address at
For MERS:
P.O. Box 2026, Flint, MI 48501-2026
For Lender:
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
or to such other address as you may designate by notice to us. Any notice provided for in this Deed of Trust shall be deemed to have been given to us or you when given in the manner designated herein.

**RELEASE:** Upon payment of all sums secured by this Deed of Trust and provided your obligation to make further advances under the Note has terminated, the Trustee shall discharge this Deed of Trust without charge to us, except that we shall pay any fees for recording of a satisfaction of this Deed of Trust.

**GENERAL:** You can waive or delay enforcing any of your rights under this Deed of Trust without losing them. Any waiver by you of any provisions of this Deed of Trust will not be a waiver of that or any other provision on any other occasion.

**TRUSTEE:** Trustee accepts the trusts herein created when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. Trustee, by its acceptance hereof, agrees to perform and fulfill the trusts herein created, and shall be liable only for its negligence or misconduct. The Trustee waives any statutory fee and agrees to accept reasonable compensation from Grantor for any services rendered by it in accordance with the terms of this Deed of Trust. Upon receipt of Trustee of instructions from Lender at any time or from time to time, Trustee shall (a) give any notice or direction or exercise any right, remedy or power hereunder or in respect of the Premises as shall be specified in such instructions, and (b) approve as satisfactory all matters required by the terms hereof to be satisfactory to Trustee or Lender. Trustee may, but need not, take any of such actions in the absence of such instructions. Trustee may resign at any time upon giving of not less than 30 days' prior notice to Lender, but will continue to act as trustee until its successor shall have been chosen and qualified. In the event of the death, removal, resignation, or refusal or inability to act of Trustee, Lender shall have the irrevocable power, with or without cause, without notice

DOC ID #: 0001541302981206

of any kind, without specifying any reason therefor, and without applying to any court, to select and appoint a successor trustee by filing a deed or other instrument of appointment for record in each office in which this Deed of Trust is recorded, and upon such recordation the successor trustee shall become vested with the same powers, rights, duties and authority of the Trustee with the same effect as if originally made Trustee hereunder. Such successor shall not be required to give bond for the faithful performance of its duties unless required by Lender.

VIRGINIA CODE PROVISIONS: This Deed of Trust is made under and pursuant to the provisions of the Code of Virginia, Sections 55-59, 55-60 and 26-49, as amended, and shall be construed to impose and confer all the rights, duties and obligations prescribed by said Sections 55-59, 55-60 and 26-49, as amended, except as herein otherwise restricted, expanded or changed, including without limitation the following rights, duties and obligations described in short form:
    (a) Exemptions waived.
    (b) Subject to call on default.
    (c) Renewal, extension, or reinstatement permitted.
    (d) Substitution of Trustee by the Lender is permitted for any reason whatsoever, and any number of times without exhausting of the right to do so.
    (e) Advertisement required in any newspaper of general circulation in

|  COUNTY | of | FREDERICK | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

once a week for two successive weeks.

THIS DEED OF TRUST has been signed by each of us under seal on the date first above written.

_Randy A Glass_
Grantor: RANDY GLASS

_Jennifer M. Glass_
Grantor: Jennifer M. Glass

_____
Grantor:

_____
Grantor:

**STATE OF VIRGINIA,**
County, ss: Frederick

The foregoing instrument was acknowledged before me this Dec 12, 2006 (date)

by Randy A Glass & Jennifer M Glass (person acknowledging)

My Commission Expires:
7.31.09   _Catherine Shannon_
           Notary Public

DOC ID #: 00015413029812006

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this TWELFTH          day of
DECEMBER, 2006 , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by
the undersigned (the "Borrower") to secure Borrower's Note to
Countrywide Bank, N.A.

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:
          102 FORTRESS DR, WINCHESTER, VA 22603-4285

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with
other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

**MULTISTATE PUD RIDER** - Single Family/Second Mortgage
                        Page 1 of 3
 -207R (0411)   CHL (12/05)(d)
                        VMP Mortgage Solutions, Inc.                        **3/99**





DOC ID #: 00015413029812006

(the "Declaration"). The Property is a part of a planned unit development known as

STAR FORT

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

DOC ID #: 0001541302981200006

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
RANDY A. GLASS                                                  - Borrower

_____ (Seal)
Jennifer M. Glass                                               - Borrower

_____ (Seal)
                                                                - Borrower

_____ (Seal)
                                                                - Borrower

-207R (0411)    CHL (12/05)              Page 3 of 3                    3/99

Prepared by: CHRISTOPHER CHAKFORD

## Countrywide Bank, N.A.

Branch #: 0000710
6440 SOUTHPOINT PARKWAY  #300
JACKSONVILLE, FL 32216
Phone: (866)205-9595
Br Fax No.: (000)000-0000

DATE:         12/12/2006
CASE #:
DOC ID #:     00015413029812006
BORROWER:  RANDY GLASS
PROPERTY ADDRESS: 102 FORTRESS DR
                  WINCHESTER, VA 22603-4285

## LEGAL DESCRIPTION EXHIBIT A

All of the following realty:

All of that certain lot or parcel of land, together with all rights, rights of way, improvements thereon and appurtenances thereunto belonging, located in Gainesboro Magisterial District, Frederick County, Virginia, and more particularly described as Lot 33, Star Fort, Section II, as shown on the plat of survey drawn by P. Duane Brown, L.S. dated May 5, 1998, attached to the Deed of Dedication dated October 1, 1998, of record in the Office of the Clerk of the Circuit Court of Frederick County, Virginia in Deed Book 921 at Page 689, et seq.;

Subject to all legally enforceable restrictive covenants and easements of record affecting the aforesaid realty.

Parcel #54N-2-2-33

Record & Return To:
On Time Settlement Services
2000 Cliff Mine Road
Park West Two, Suite 210
Pittsburgh, PA  15275
412-788-5212

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)



* 2 3 9 9 1 *

A Copy Attest:
Frederick County Circuit Court
Rebecca P. Hogan, Clerk

by _Kathy G. Strosnider_
Deputy Clerk



* 1 5 4 1 3 0 2 9 8 0 0 0 0 0 2 E 0 3 2 *

VIRGINIA: FREDERICK COUNTY, SCT.
This instrument of writing was produced to me on
_12-29-2006_ at _9:27 am_
and with certificate of acknowledgement thereto annexed,
was admitted to record. Tax imposed by Sec. 58.1-802 of
$ _NA_ , and 58.1-801 have been paid, if assessable

_Rebecca P. Hogan_ , Clerk

060024342

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CHRISTOPHER CHAKFORD

AMERICA'S WHOLESALE LENDER

6440 SOUTHPOINT PARKWAY #300
JACKSONVILLE
FL 32216

RPC/Tax Map Reference #/Parcel I.D. #:

──────────────── [Space Above This Line For Recording Data] ────────────────

** TICOR Title Insurance Company
    Policy Number not available at this time

0001541302901206
[Doc ID #]

Record & Return To:                **DEED OF TRUST**
On Time Settlement Services            MIN 1000157-0007575013-9
2000 Cliff Mine Road
Park West Two, Suite 210
Pittsburgh, PA 15275
412-788-5212
20060b0365

The following information, as further defined below, is provided in accordance with Virginia law.

This Deed of Trust is given by
RANDY GLASS , UNMARRIED
A

Jennifer M Glass

as Borrower (trustor), to
**FREDERICK** SAMUEL I WHITE, PC
209 BUSINESS PARK DRIVE, VIRGINIA BEACH, VA 23462
N/A
N/A
as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc. as beneficiary.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

VIRGINIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 12

VMP -6A(VA) (0507)    CHL (05/06)(d)    VMP Mortgage Solutions, Inc.    Form 3047  1/01
CONV/VA



*23991*                                    *15413029000002006A*

DOC ID #: 00015413029012006

**(A) "Security Instrument"** means this document, which is dated   DECEMBER 12, 2006   , together with all Riders to this document.

**(B) "Borrower"** is
RANDY GLASS   and Jennifer M. Glass

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of  NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613

**(D) "Trustee"** is
**FREDERICK** SAMUEL I WHITE, PC
Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is
209 BUSINESS PARK DRIVE, VIRGINIA BEACH, VA 23462

**"Trustee"** is
N/A
Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is
N/A

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated   DECEMBER 12, 2006   . The Note states that Borrower owes Lender
TWO HUNDRED NINETY SEVEN THOUSAND SIX HUNDRED and 00/100

Dollars (U.S. $ 297,600.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   JANUARY 01, 2037   . The interest rate stated in the Note is SIX & THREE-QUARTERS   percent (   6.750 %). If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

DOC ID #: 00015413029012006

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | FREDERICK | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of
                    102 FORTRESS DR, WINCHESTER                        ,
                              [Street/City/County]
Virginia 22603-4285 ("Property Address"):
        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

DOC ID #: 0001541302901 2006

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

DOC ID #: 0001541302901206

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on

DOC ID #: 0001541302901 2006

such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments

DOC ID #: 0001541302901206

toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

DOC ID #: 0001541302901 2006

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify

DOC ID #: 0001541302901206

Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

DOC ID #: 0001541302901200б

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

DOC ID #: 0001541302901200 6

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
RANDY GLASS                      -Borrower

_____ (Seal)
Jennifer M Glass                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

**STATE OF VIRGINIA,** FREDERICK County, ss:

DOC ID #: 00015413029012006

The foregoing instrument was acknowledged before me this December 12, 2006 by

Randy A Glass & Jennifer N Glass

My Commission Expires: 7·31·09    Catherine Shannon
Notary Public

# PLANNED UNIT DEVELOPMENT RIDER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
PARCEL ID #:

Prepared By:
CHRISTOPHER CHAKFORD
AMERICA'S WHOLESALE LENDER


6440 SOUTHPOINT PARKWAY #300
JACKSONVILLE
FL 32216


00015413029012006
[Doc ID #]


THIS PLANNED UNIT DEVELOPMENT RIDER is made this TWELFTH                day of
DECEMBER, 2006    , and is incorporated into and shall be deemed to amend and supplement
the, Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by
the undersigned (the "Borrower") to secure Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:
102 FORTRESS DR
WINCHESTER, VA 22603-4285
[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with

---

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
 -7R (0405)      CHL (06/04)(d)         Page 1 of 3                     Initials:
VMP Mortgage Solutions, Inc. (800)521-7291          **Form 3150 1/01**



* 2 3 9 9 1 *                                        * 1 5 4 1 3 0 2 9 0 0 0 0 0 0 0 2 0 0 7 R *

DOC ID #: 0001541302901200 6

other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

(the "Declaration"). The Property is a part of a planned unit development known as
STAR FORT

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and
(iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay,
when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender
and which provides insurance coverage in the amounts (including deductible levels), for the periods,
and against loss by fire, hazards included within the term "extended coverage," and any other
hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance,
then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly
premium installments for property insurance on the Property; and (ii) Borrower's obligation under
Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent
that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage
provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair
following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable
to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the
sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to
Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure
that the Owners Association maintains a public liability insurance policy acceptable in form, amount,
and extent of coverage to Lender.

D. Condemnation. The proceeds of any award or claim for damages, direct or consequential,
payable to Borrower in connection with any condemnation or other taking of all or any part of the
Property or the common areas and facilities of the PUD, or for any conveyance in lieu of
condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by
Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's
prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or
termination of the PUD, except for abandonment or termination required by law in the case of
substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent
domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the

Initials: _____

-7R (0405)       CHL (06/04)              Page 2 of 3                    Form 3150 1/01

DOC ID #: 0001541302901 2006

express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
RANDY A. GLASS                           - Borrower

_____ (Seal)
Jennifer M Glass                          - Borrower

_____ (Seal)
                                          - Borrower

_____ (Seal)
                                          - Borrower

-7R (0405)      CHL (06/04)       Page 3 of 3          Form 3150  1/01

Prepared by: CHRISTOPHER CHAKFORD

## AMERICA'S WHOLESALE LENDER

Branch #: 0000710
6440 SOUTHPOINT PARKWAY  #300
JACKSONVILLE, FL 32216
Phone: (866)205-9595
Br Fax No.: (000)000-0000

DATE:          12/12/2006
CASE #:
DOC ID #:      00015413029012006
BORROWER: RANDY GLASS
PROPERTY ADDRESS: 102 FORTRESS DR
                 WINCHESTER, VA 22603-4285

## LEGAL DESCRIPTION EXHIBIT A

All of the following realty:

All of that certain lot or parcel of land, together with all rights, rights of way, improvements thereon and appurtenances thereunto belonging, located in Gainesboro Magisterial District, Frederick County, Virginia, and more particularly described as Lot 33, Star Fort, Section II, as shown on the plat of survey drawn by P. Duane Brown, L.S, dated May 5, 1998, attached to the Deed of Dedication dated October 1, 1998, of record in the Office of the Clerk of the Circuit Court of Frederick County, Virginia in Deed Book 921 at Page 689, et seq.;

Subject to all legally enforceable restrictive covenants and easements of record affecting the aforesaid realty.

Parcel #54N-2-2-33

VIRGINIA: FREDERICK COUNTY.SCT.
This instrument of writing was produced to me on
12-29-2006 at 9:20 am
and with certificate acknowledgement thereto annexed
was admitted to record. Tax imposed by Sec. 58.1-802 of

$ NA , and 58.1-801 have been paid, if assessable.

*Rebecca P. Hogan* , Clerk

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)

*23991*

*1541302800000002006A*

A Copy Attest:
Frederick County Circuit Court
Rebecca P. Hogan, Clerk

by _Kathy G. Stenson_
Deputy Clerk